IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Sensus USA, Inc. f/k/a Sensus )
Metering Systems, Inc., )
 )
    Plaintiff, )
 )
vs. ) Civil Action No. 10-1363
 )
Elliott Bay Engineering, Inc., )
 )
    Defendant. )
 )

AMBROSE, Senior District Judge

# OPINION
## and
# ORDER OF COURT

    Plaintiff Sensus USA, Inc. f/k/a Sensus Metering Systems, Inc. ("Sensus") has brought this diversity action against Defendant Elliott Bay Engineering, Inc. ("Elliott") seeking declaratory judgment regarding Sensus's obligations under a license agreement it entered into with Elliott. Sensus also alleges breach of the license agreement by Elliott. Elliott, in turn, has filed a first amended counterclaim against Sensus alleging common law claims for breach of contract, unjust enrichment, and a claim for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. § 5301 *et seq.* Pending before the court is Sensus's Motion to Partially Dismiss Defendant's First Amended Counterclaim. (Docket No. 10). Specifically, Sensus seeks dismissal of Elliott's unjust enrichment and misappropriation of trade secrets claims. Elliott opposes the motion to dismiss. (Docket No. 17). After careful consideration, Defendant's motion to dismiss is granted in part and denied in part as more fully set forth below.

## I. Background[1]

### A. Factual Background

Elliott is a Washington corporation that provides engineering, consulting and related support services in the field of electrical power distribution, power generation, power conversion and industrial controls. It supports new and existing electrical utilities, industrial manufacturing and commercial facilities. In its Answer to Sensus's Complaint, Elliott admitted that Sensus is a Delaware corporation that manufactures and sells products to entities in the energy industry, including manufacturing and selling electric meters to the electric utility market.

In 2004, Elliott was working with Advanced Metering Data Systems, LLC ("AMDS") to add an external remote connect/disconnect capability to AMDS's existing efforts to install its RF AMR transceiver technology into a Sensus iCon meter. In the process of developing the external remote connect/disconnect feature for the integration of AMDS's technology into the Sensus iCon meter, Elliott conceived of, worked independently on and succeeded in placing a remote connect/disconnect switch inside a Sensus iCon meter (i.e. "under glass") for the first time.

In January 2005, Elliott attended a trade show that Sensus representatives also attended. Elliott informed Sensus of Elliott's successful effort of placing a remote connect/disconnect switch "under glass" in a Sensus iCon meter. Sensus eagerly requested Elliott to demonstrate the discovery to the Sensus representatives. Subject to a confidentiality agreement, Elliott showed the preliminary design concept and assembly to the Sensus representatives who were attending the trade show. The Sensus representatives later told Elliott that until Elliott showed them that it could be done, they did not realize that a remote connect/disconnect switch could be housed "under glass," i.e., inside a Sensus meter. The Sensus representatives at the trade show immediately informed Elliott that Sensus would like to

---
[1] Unless otherwise noted, the facts in this section are taken from Elliott's First Amended Counterclaim. (Docket No. 8).

have a connect/disconnect switch placed inside its iCon meter and to make this high demand feature available commercially.

In February 2005, very shortly after the trade show, Sensus sent some of its iCon meters to Elliott so that Elliott could continue its work on the design and development of the remote connect/disconnect feature inside a Sensus iCon meter. The challenge presented was to get a switch to fit securely in the existing molded plastic bracket on which the remaining controls for the meter were mounted, taking into account the AMDS efforts described above.

Between February and October 2005, Sensus was working on other changes and improvements to the controls mounted inside the iCon meter. Dale Lange of Elliott interfaced with Sensus representatives to coordinate the new remote connect/disconnect switch design with the other changes on which Sensus was working for the interior of the iCon meter.

Sensus later informed Elliott that it wanted an interior switch for both its 2S and 12S meters. In April 2005, at Sensus's request, Elliott sent Sensus a sample of the switch design, as it had developed through that date, to use the sample at a trade show in Las Vegas. The sample was well received at the Las Vegas trade show. On the heels of the Las Vegas trade show, Sensus informed Elliott that Sensus looked forward to reaching an agreement with Elliott for commercializing the disconnect relay.

Between April 2005 and October 2005, Elliott and Sensus negotiated the terms for commercializing the disconnect relay.[2] In August 2005, Sensus announced a partnership with AMDS to incorporate AMDS's FlexNet communications network into Sensus's meters.[3] In September 2005, Elliott sent another sample to Sensus. By this time, Elliott and Sensus had

---

[2] In June 2005, Sensus liked Elliott's work so much that it engaged Elliott to work on another project with Consolidated Edison ("ConEd") that was unrelated to the iCon meter remote connect/disconnect switch. Elliott worked on the iCon meter connect/disconnect project and the ConEd project without any complaint from Sensus about Elliott's performance.

[3] AMDS is the same company with whom Elliott had been working in 2004 to design a remote connect/disconnect switch to work with AMDS's radio meter.

negotiated all of the business points in the agreement to commercialize the switch design. Arlen Rummel of Sensus informed Dale Lange of Elliott that Rummel was glad the agreement was behind them and that the next step was to inspect for load voltage before reconnect and finalization of the design for the reset mechanism. On October 3, 2005, Sensus and Elliott executed the License Agreement at issue in this case, the negotiation of which already had been finalized in September.[4]

In February 2006, Sensus called a meeting to address finalization of integration of the remote connect/disconnect switch into the Sensus meter. At this meeting, Sensus discussed a new meter they were developing and wanted to make sure that the remote connect/disconnect switch as developed by Elliott would fit in this new meter as well. By this point, the issues were focused on getting the functionality of AMDS's FlexNet controls from the control card, where they resided as of that time, up onto the Sensus display board. Eliminating the AMDS control board from the control rack would make more room for the Elliott-designed remote connect/disconnect switch integration and would further solve temperature issues inside the meter. Based on the February 2006 meeting, there was nothing further that Elliott was asked to do relative to integrating the remote connect/disconnect switch inside the Sensus iCon meter. Later in February 2006, Sensus informed Elliott that Sensus now wanted pricing from the third party manufacturer for the 200 amp switch.

During the Spring of 2006, the supplier of the remote connect/disconnect switch used by Elliott in the design began selling a newer model of the switch. Sensus unilaterally determined that it wanted to use the newer model switch. Sensus's internal engineering department undertook on its own to configure bus bars to mount the newer model of the remote connect/disconnect switch in the iCon/FlexNet meter. During that same Spring, however, Sensus enlisted Elliott's assistance to obtain from the switch manufacturer a 3D model of the

---

[4] A copy of the License Agreement is attached as Exhibit "A" to Sensus's Complaint (Docket No. 1) and incorporated by reference into Elliott's First Amended Complaint.

newer-model switch so that the bus bars could be developed. Elliott worked on behalf of Sensus to obtain the model, drawings, and other requests made to the manufacturer to enable Sensus to configure the mount for the updated switch model using substantially the same principles that Elliott had used to mount the remote connect/disconnect switch inside the Sensus iCon meter. Elliott also worked during the Spring or Summer 2006 on behalf of Sensus to expedite the procurement from the switch manufacturer of the newer model switch.

During the Spring of 2006, Sensus was in discussions with AMDS to acquire AMDS or substantially all of its assets. The acquisition of AMDS and its FlexNet technology combined with the exclusive license from Elliott would give Sensus a significant competitive advantage in the marketplace. In June 2006, Sensus announced the acquisition of all or substantially all of the assets of AMDS.[5] Between its acquisition of AMDS and the present, Sensus has announced major contracts with utility companies for the sale of its (formerly AMDS's) FlexNet metering system, which now included the ability to remotely connect and disconnect the customer's service via the switch inside Sensus's meters.

On an unknown date after its acquisition of AMDS's assets, Sensus began producing on its own the remotely enabled connect/disconnect meter, incorporating information, methods, techniques, and devices that Elliott demonstrated to Sensus in confidence and only for a limited purpose.

In June 2010, Elliott requested audit information from Sensus to determine whether, and if so, how many iCon meters had been sold containing the remote connect/disconnect switch that would entitle Elliott to royalty payments. Sensus refused to comply with Elliott's requests for audit information. Elliott contends that in 2010, Sensus fabricated an argument that Elliott had breached its obligations under the License Agreement. According to Elliott, having acquired all of the technology to market and sell meters with the FlexNet communications

---

[5] From June 2006 and thereafter, Elliott continued to work on the ConEd project and, when requested, continued to support Sensus's efforts to interface with the remote connect/disconnect switch manufacturer and to market the under glass connect/disconnect feature.

system and the ability to connect and disconnect a customer's service remotely and "under glass," Sensus has breached its payment obligations and wishes to avoid those obligations under the License Agreement.

Elliott alleges that Sensus wanted to acquire the engineering and design for the remote connect/disconnect under glass switch that Elliott provided, with no intention of paying more than the initial non-refundable license fee of $60,000 for it. Sensus has not paid any royalties to Elliott despite allegedly having sold thousands of meters that would entitle Elliott to royalty payments under the License Agreement. Elliott complains that the license from Elliott significantly enhances Sensus's competitive position in the marketplace and has resulted in, and will continue to result in, millions of dollars of revenues that Sensus would not have enjoyed in the absence of the license granted pursuant to the License Agreement and in the absence of all of the work that Elliott performed on behalf of Sensus with respect to the remote connect/disconnect under glass switch.

Sensus never provided a termination notice pursuant to Section 7.2 of the License Agreement or otherwise notified Elliott of any alleged breach based on the matters Sensus alleges in its Complaint. Elliott further contends that Sensus has sublicensed or attempted to sublicense the Licensed Product to others as defined in the License Agreement, but that the License Agreement does not expressly or by implication permit the sublicensing of the Licensed Product.

### B. Procedural History

On October 15, 2010, Sensus filed the instant action in this Court seeking declaratory judgment and alleging breach of contract against Elliott. (Docket No. 1). On March 30, 2011, Elliott filed an Answer and Affirmative Defenses to Sensus's Complaint as well a counterclaim against Sensus. (Docket No. 4). On April 14, 2011, Elliott filed a First Amended Counterclaim alleging common law claims for breach of contract, unjust enrichment, and a claim for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 12

Pa. Cons. Stat. § 5301 *et seq.*. (Docket No. 8). On May 2, 2011, Sensus filed the instant Motion to Partially Dismiss Elliott's First Amended Counterclaim. (Docket No. 10). Elliott opposes Sensus's motion. (Docket No. 17). The motion is now ripe for my review.

## II. Legal Analysis

### A. Legal Standard

Defendant filed its Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. When deciding whether to grant or deny a 12(b)(6) motion the Supreme Court has held:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Bell Atlantic Co. v. Twombly, 550 U.S. 544, 555 (2007) (citations and footnote omitted); see also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (a plaintiff's factual allegations must be enough to raise a right to relief above the speculative level).

Most recently, in Ashcroft v. Iqbal, ___ U.S.___, 129 S. Ct. 1937 (2009), the Supreme Court held, ". . . a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citations omitted).

In Iqbal, the Court specifically highlighted the two principles which formed the basis of the Twombly decision: First, for the purposes of a motion to dismiss, courts must accept as true all factual allegations set forth in the complaint, but courts are not bound to accept as true any legal conclusions couched as factual allegations. Id. at 1949-50; see also Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009). Second, a complaint will survive a motion to dismiss only if it states a plausible claim for relief, which requires a court to engage in a context-specific

task, drawing on the court's judicial experience and common sense. Iqbal, 129 S. Ct. at 1950; Fowler, 578 F.3d at 210-11. Where well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – the complainant is entitled to relief. Iqbal, 129 S. Ct. at 1950 (citing Fed. R. Civ. P. 8(a)(2)).

**B. Motion to Dismiss**

Sensus moves to dismiss two counts of Elliott's First Amended Counterclaim: Count II (unjust enrichment) and Count III (misappropriation of trade secrets pursuant to the PUTSA). Sensus does not seek dismissal of Count I (breach of contract) of the First Amended Counterclaim at this juncture. After careful consideration, Sensus's motion is granted in part and denied in part for the reasons set forth below.

**1. Unjust Enrichment**

In Count II of the First Amended Counterclaim, Elliott alleges that the remote connect/disconnect under glass switch design and other work it performed on behalf of Sensus has conferred enormous economic benefits on Sensus and that Sensus knowingly received and appreciated those benefits. First Am. Counterclaim ¶ 49. Elliott also contends that Sensus received and appreciated enormous economic benefits from attempts to sublicense its rights under the License Agreement without Elliott's consent. Id. ¶ 50. Elliott avers that Sensus has received these benefits under circumstances that would render it unjust for Sensus to retain the benefits without fair and reasonable compensation to Elliott. Id. ¶¶ 49-50. Sensus moves to dismiss the unjust enrichment count on the grounds that an unjust enrichment claim is precluded where the parties have entered into an express contract. Elliott counters that dismissal of the claim on this basis is inappropriate at this stage of the proceedings. I agree with Elliott.

Although Sensus is correct that breach of contract and unjust enrichment claims generally cannot coexist in the end, both the Federal Rules of Civil Procedure and well-established case law permit plaintiffs to plead in the alternative. See Fed. R. Civ. P. 8(e)(2) ("A

party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count . . . or in separate counts. . . . A party may also state as many separate claims . . . as the party has, regardless of consistency and whether based on legal, equitable, or maritime grounds."). There is no exception to the alternative pleading rule for contract and unjust enrichment claims. As one federal court has explained:

> It is true that under Pennsylvania law, a contract prevents a party from making a claim of unjust enrichment; recovery is limited to the measure provided for in the contract. However, Federal rules allow pleading in the alternative. Courts have permitted plaintiffs to pursue alternative theories of recovery based both on breach of contract and unjust enrichment, even when the existence of a contract would preclude recovery under unjust enrichment.

United States v. Kensington Hosp., 760 F. Supp. 1120, 1135 (E.D. Pa. 1991); see also Cornell Cos., Inc. v. Borough of New Morgan, 512 F. Supp. 2d 238, 265-66 (E.D. Pa. 2007).

Because federal law plainly permits pleading in the alternative, Sensus's Motion to Dismiss Count II of the First Amended Counterclaim is denied. If appropriate, Sensus may raise the issue later in a post-discovery motion for summary judgment.

### 2. Misappropriation of Trade Secrets – PUTSA

In Count III of the First Amended Counterclaim, Elliott alleges that Sensus misappropriated Elliott's trade secrets in violation of the PUTSA.[6] First Am. Counterclaim ¶¶ 51-

---

[6] The PUSTA defines "misappropriation" as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

57. Sensus moves to dismiss this count on two grounds. First, Sensus argues that this Count should be dismissed because the First Amended Counterclaim fails to identify what trade secrets Sensus allegedly misappropriated. Second, Sensus argues that the claim should be dismissed under Pennsylvania's "gist of the action" doctrine because Elliott is trying to recast its breach of contract claim into a misappropriation of trade secrets claim in an improper attempt to obtain a measure of damages beyond that to which Elliott would be entitled under the express terms of the contract. Elliott opposes both points.

After careful consideration, I agree with Sensus that Elliott's First Amended Counterclaim fails to sufficiently identify the trade secrets Sensus allegedly misappropriated. The PUTSA defines a "trade secret" as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302. In "describing" the alleged trade secrets at issue, Count III of the First Amended Counterclaim states only that "Elliott developed, designed, derived, and possessed *information* that constitutes proprietary trade secrets belonging exclusively and solely to Elliott: . . ." First Am. Counterclaim ¶ 52 (emphasis added); see also id. ¶ 53 (". . . a. Sensus knew or had reason to know[] that the *information, methods, and techniques* that Elliott

---

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302.

possessed were trade secrets that were not known to Sensus or the general public." (emphasis added)).

Elliott argues that its counterclaim is sufficient because, as this Court has previously held, "a claim for misappropriation of trade secrets need not be pleaded with particularity," even after Twombly. Elliott Opp. Br. (Docket No. 17) at 14-15 (citing Center Pointe Sleep Assocs, LLC v. Panian, Civ. A. No. 08-1168, 2009 WL 789979 (W.D. Pa. Mar. 18, 2009) and Ideal Aerosmith, Inc. v. Acutronic USA, Inc., Civ. A. No. 07-1029, 2007 WL 4394447 (W.D. Pa. Dec. 13, 2007)). Elliott's reliance on my decisions in Center Pointe and Ideal Aerosmith is misplaced. Although these cases do not require a plaintiff to describe trade secrets with particularity, neither decision suggests that a complaint that fails to describe the relevant trade secrets *at all* would survive a motion to dismiss. To the contrary, the complaints in both cases set forth at least a general identification of the trade secrets at issue. See Center Pointe, 2009 WL 789979, at *1 (complaint described the trade secrets at issue as relating to "the truck driver sleep apnea screening proposal designed by Center Pointe" as well as "client and prospective client lists" and marketing materials and strategies of Center Pointe"); Ideal Aerosmith, 2007 WL 4394447, at *8 (complaint identified the trade secrets as relating to "information concerning the development, marketing and sale of Ideal's Aero 4000 motion controller, customer communications and other property").

In this case, by contrast, the counterclaim does not provide even a general description of what "information" or "information, methods, and techniques" the alleged trade secrets consist of. As Twombly and its progeny make clear, a formulaic recitation of the elements of a cause of action will not suffice. See Twombly, 550 U.S. at 555. At best, I can speculate as to the possible nature of the trade secrets based on factual allegations set forth elsewhere in the First

Amended Counterclaim. Factual allegations, however, must be sufficient to raise a right to relief *above* the speculative level to meet federal notice pleading standards. See id.

Because the First Amended Counterclaim contains only a conclusory description of the trade secrets at issue, Elliott's misappropriation of trade secrets claim fails to meet federal notice pleading standards and must be dismissed. Since the counterclaim is lacking factually, this dismissal is without prejudice, and Elliott may file a Second Amended Counterclaim curing the factual deficiency.

In light of the above ruling, it is unnecessary to address the second argument Sensus raises – i.e., that Elliott's trade secrets counterclaim is barred by Pennsylvania's gist of the action doctrine – except to note that the "gist of the action" doctrine is not an automatic bar to misappropriation of trade secrets claims every time there is a breach of contract claim.

Pennsylvania's "gist of the action" doctrine bars tort claims: (1) that arise solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract. See eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002). Although the gist of the action test precludes misappropriation of trade secrets claims where the parties' obligations are defined solely by the terms of the contract, claims for misappropriation of trade secrets not covered by the agreement at issue may go forward. See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 106-07 (3d Cir. 2001). Because the application of the gist of the action doctrine depends on the facts of each particular case and, as set forth above, the nature of the relevant trade secrets in this case is currently unclear, this issue is best left for resolution on a post-amendment motion to dismiss or, even more appropriately, on a post-discovery motion for summary judgment.

## III. CONCLUSION

For all of the reasons set forth above, Sensus's motion to dismiss Count II of Elliott's First Amended Counterclaim (unjust enrichment) is denied. Sensus's motion to dismiss Count III of Elliott's First Amended Counterclaim (misappropriation of trade secrets - PUTSA) is granted without prejudice, and Elliott is granted leave to amend that count.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Sensus USA, Inc. f/k/a Sensus Metering Systems, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Elliott Bay Engineering, Inc., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 10-1363 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

AMBROSE, Senior District Judge

## **ORDER OF COURT**

AND NOW, this 6th day of July, 2011, after careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered that Sensus USA, Inc. f/k/a Sensus Metering Systems, Inc.'s ("Sensus") Motion to Dismiss (Docket No. [10]) is granted in part and denied in part as follows. Sensus's motion to dismiss Count II (unjust enrichment) of the First Amended Counterclaim is denied. Sensus's motion to dismiss Count III (misappropriation of trade secrets) of the First Amended Counterclaim is granted without prejudice as set forth more fully in the Opinion accompanying this Order. Elliott may file a Second Amended Counterclaim on or before July 21, 2011.

                                                  BY THE COURT:

                                                  /s/ Donetta W. Ambrose
                                                  Donetta W. Ambrose
                                                  Senior U.S. District Judge